OA 91 Criminal Complaint

# United States District Court

| NORTHERN | DISTRICT OF | CALIFORNIA |

UNITED STATES OF AMERICA
V.

Pablo Cesar Esquivel,
Miguel Alvarez-Casteneda, and
Roberto Matos

**E-FILING**

CRIMINAL COMPLAINT

Case Number: 08-70325 RS

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state that the following is true and correct to the best of my knowledge and belief. On or about __June 3, 2008__ in __Santa Clara__ County, in
                                                                                    (Date)
the __Northern__ District of __California__ defendant(s) did,

(Track Statutory Language of Offense)
knowingly and intentionally manufacture, distribute, and dispense, and possess with intent to manufacture, distribute, and dispense, a controlled substance, to wit: cocaine

in violation of Title __21__ United States Code, Section(s) __841(a)(1); 841(b)(1)(B)(ii)(II); & 846__.

I further state that I am a(n) __Special Agent for the Drug Enforcement Agency__ and that this complaint is based on the following facts:

See attached affidavit of Anthony J. Herrera which is made part of this criminal complaint.

Continued on the attached sheet and made a part hereof:    ☒ Yes    ☐ No

Approved
As To Form: __Daniel Kaleba__
         AUSA

_____
Name/Signature of Complainant

Sworn to before me and subscribed in my presence,

June 4, 2008                                                       at    San Jose, California
Date                                                                       City and State

Richard Seeborg          United States Magistrate Judge
Name & Title of Judicial Officer                                     Signature of Judicial Officer

AFFIDAVIT OF ANTHONY J. HERRERA IN SUPPORT OF COMPLAINT

I. INTRODUCTION AND PERSONAL QUALIFICATIONS

I, Anthony J. Herrera, being duly sworn, state as follows:

1. I am a Drug Enforcement Administration (DEA) Special Agent currently assigned to the San Jose Resident Office (SJRO). As a special agent with the DEA, my investigations focus on large-scale narcotic offenders. I have been a Special Agent with the DEA since March 3, 2006. Since being employed by the DEA, I conservatively estimate that I have been involved in at least 80 drug investigations, in the arrest of over 50 drug trafficking violators, and that, on at least 40 occasions, I have been involved in searches of residences in connection with drug investigations. As a result of my training and experiences, I am familiar with how various drugs, including Cocaine, are used and the typical distribution and trafficking methods used by drug dealers and traffickers. I am also familiar with the various methods generally utilized by traffickers to transport drugs in and through the state of California.

2. I have spoken to, and worked with, more experienced federal, state, and municipal narcotics agents and officers. During the course of my employment as a Special Agent, I have participated in numerous investigations of illicit drug trafficking organizations. These investigations have involved the use of confidential informants, wire and physical surveillance, telephone toll analysis, investigative interviews, and the service of search and arrest warrants. These investigations include the unlawful importation, possession with intent to distribute, and distribution of controlled substances, as well as the related laundering of monetary instruments, the conducting of monetary transactions involving the proceeds of specified unlawful activities, and conspiracies associated with criminal narcotics offenses, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

3. I have been involved in the execution of numerous state and federal narcotics related search warrants. As a result, I have encountered and become familiar with the various tools, methods, trends, paraphernalia, and related articles used by traffickers and trafficking

1

organizations in their efforts to import, conceal, manufacture and distribute controlled substances.

4. Furthermore, I have interviewed drug dealers, users, and confidential informants and have discussed with them the lifestyles, appearances, and habits of drug dealers and users. I have become familiar with the manner in which narcotics traffickers smuggle, transport, store, and distribute narcotics, as well as how they collect and launder drug proceeds. I am also familiar with the manner in which narcotics traffickers use telephones, cellular telephone technology, pagers, coded communications or slang-filled conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations.

5. I have discussed packaging, preparation, method of operation, and security measures which are often employed by narcotics traffickers. I have examined records consisting in part of buyer's and seller's lists, and pay/owe ledgers. I have also examined documentation of various methods in which Cocaine and other illegal drugs are produced.

6. During these investigations, I have worked in an undercover capacity in order to obtain evidence and to obtain information concerning narcotics traffickers and the inner working of drug organizations. Based upon my training and experiences, I know that it is common practice for narcotics traffickers to routinely utilize pagers, telephones, and cellular telephones in order to communicate with their customers, suppliers, couriers, and other co-conspirators and in order to insulate themselves from detection by law enforcement. Moreover, it is not unusual for them to initiate such service under the name of an associate or a fictitious name. Furthermore, it is not unusual for narcotic traffickers to utilize false or incomplete address(es) while filling out subscriber information related to their cellular telephone(s).

7. In a number of residential searches executed in connection with the drug investigations in my office and I have been involved, the following kinds of drug-related evidence have typically been recovered: (1) controlled substances; (2) paraphernalia for

1  manufacturing, packaging, processing, diluting, weighing, and distributing controlled substances,
2  to wit: scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags,
3  hear-sealing devices, and dilutants; (3) books, records, receipts, notes, computers, disks, CDs,
4  palm pilots, ledgers and other papers relating to the manufacture and distribution of controlled
5  substances; (4) personal books and papers reflecting names, addresses, telephone numbers, and
6  other contact/identification data relating to the distribution of controlled substances; (5) cash,
7  currency, and records relating to the income and expenditures of money and wealth relating to
8  controlled substances, including money orders, wire transfer and cashier's check receipts, bank
9  statements, passbooks, checkbooks, and check registers. In addition, during the course of the
10 aforementioned searches, agents have also found items of personal property which tend to
11 identify the person(s) in the residences and related vehicles, such as billing statements,
12 identification documents, and keys.
13      8.      Based upon my training and experiences, as well as the corporate knowledge and
14 experience of other agents in my office, I am aware that it is generally a common practice for
15 drug traffickers to store their drug inventory and drug related paraphernalia (described above) in
16 their residences and vehicles. Furthermore, it is generally a common practice for drug traffickers
17 to maintain their records relating to their drug trafficking activities. Because drug traffickers in
18 many instances will "front", i.e. give with an expectation of later payment, controlled substances
19 to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such
20 record-keeping is necessary to keep track of the amounts paid and owed, and such records could
21 also be maintained close at hand so as to readily ascertain current balances. Additionally,
22 telephone/address listings of clients and suppliers necessarily may be maintained and be
23 immediately available to other drug traffickers in order to efficiently conduct their drug
24 trafficking business. Moreover, it is also a generally common practice for traffickers to conceal
25 at their residences and inside their vehicles large sums of money, either the proceeds from drug
26 sales or funds to be utilized to purchase controlled substances. In this connection, drug
27
28                                                3

traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in their residences and vehicles.

9. My awareness of these drug trafficking practices, as well as my knowledge of drug use and distribution techniques as set forth in this Affidavit, arise from the following: (a) my own involvement in drug investigations and searches during my career as a law enforcement officer, as previously described; (b) my involvement in what other agents and police officers have advised me when relating the substance of their similar debriefings and the results of their own drug investigations; and (c) other intelligence information provided through law enforcement channels.

10. I am also aware from my own experience and training that drug traffickers commonly maintain firearms, ammunition, and other weapons in their vehicles and residences for the purpose of protecting their drug inventory and drug proceeds stored there, not only from law enforcement personnel but also other drug traffickers who may attempt to "rip" them off. Weapons, firearms, and ammunition have been recovered in several drug investigation searches that I have been involved in. I am also aware that drug traffickers frequently secret cash proceeds and other evidence of their drug trafficking activities inside locked safes, boxes, or containers that are maintained in property under their control.

11. I make this affidavit in support of a criminal complaint against Pablo Cesar Esquivel, Miguel Alvarez-Castaneda, and Roberto Matos for a violation of Title 21, United States Code, §§ 841(a)(1), 841(b)(1)(B)(ii)(II) and 846, conspiracy to possess with intent to distribute Cocaine HCL.

## II. FACTS SUPPORTING PROBABLE CAUSE

12. The application for this complaint results from an investigation conducted by DEA agents of an individual known as "Cesar," later identified as Pablo Cesar Esquivel

4

regarding the distribution of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(ii)(II) and 846.

13. On or about April 28, 2008, agents from the DEA's San Jose Office spoke with a confidential source, hereafter referred to as "CS," regarding the cocaine-trafficking activities of "Cesar," later identified as Pablo Cesar ESQUIVEL, operating in the Sunnyvale, California area. ESQUIVEL purported himself to the CS as a supplier able of selling multiple kilograms of cocaine.

### A. The First Controlled Purchase of Cocaine

14. On May 6, 2008, the CS placed a monitored and recorded phone call to ESQUIVEL for a sample of cocaine with the suggestion that the CS might purchase more at a later time. In a subsequent phone call, ESQUIVEL gave the CS directions to ESQUIVEL's residence at 775 East Duane Avenue, Sunnyvale, California and told the CS to come by to collect the sample of cocaine. In preparation, the CS's person and automobile were searched by agents. No controlled substances were found. The CS was also outfitted with a hidden radio transmitter to wear on his/her person, which would let agents monitor and record the events. Agents observed CS drive to ESQUIVEL's residence and meet with him.

15. During a subsequent debriefing, the CS told the agents the following. ESQUIVEL invited the CS inside his (ESQUIVEL's) apartment. The CS declined and waited outside in the parking lot. ESQUIVEL went into the apartment complex for a few moments and returned to the parking lot with a small sample of suspected cocaine contained in two small plastic wrapped bindles of white powder which he gave to the CS. ESQUIVEL stated to the CS that he (ESQUIVEL) wanted to show the CS "the big stuff." ESQUIVEL and the CS discussed prices for quarter kilogram and full kilogram quantities of cocaine. The CS did not bring the money to pay for the sample at that time and told ESQUIVEL that he/she would pay for it the following day.

///

16. Agents observed the CS as he/she departed the area of the residence and subsequently collected the sample of suspected cocaine. Agents field-tested a small portion of the sample for the presence of cocaine. The sample tested presumptive positive for the presence of cocaine. A check of the recording made from the hidden radio transmitter revealed that although it functioned, the quality of the recording was very poor.

17. The next day, May 7, 2008, the CS again placed a monitored and recorded phone call to ESQUIVEL. They discussed payment for the sample previously given. The CS told ESQUIVEL that the sample was of good quality. ESQUIVEL told the CS that he (ESQUIVEL) had "plenty," and that the CS could come have a look. The CS agreed to go to ESQUIVEL's residence to pay for the sample. In a later phone call ESQUIVEL told the CS to park in the back in the space marked "B." The CS's person and vehicle were again searched by agents. No controlled substances were found. The CS was again provided with a hidden radio transmitter. Agents followed the CS as he/she traveled to 775 East Duane Avenue, Sunnyvale, California. They observed him/her park his/her vehicle. They observed ESQUIVEL come out of his residence and meet the CS. Agents then observed both go inside the residence.

18. At a subsequent debriefing, the CS told agents the following. Once inside, the CS paid ESQUIVEL $40.00 of U.S. Currency for the sample of cocaine received the previous day. CS stated that ESQUIVEL took him/her to a back bedroom and pulled out a silver suitcase from the foot of the bed and opened it. The CS stated that there was what appeared to be taped brick of what would be described as the approximate size of a wrapped kilogram of cocaine on the right side of the suit case. On the left side of the suitcase, the CS observed a plastic grocery bag containing what appeared to be approximately 40 smaller bags containing white powder. From the size of the bag that the CS described, agents believe that the bags may have contained half-ounce quantities of suspected cocaine. To the right of the taped brick was an envelope which appeared to the CS to contain an undetermined amount of U.S. Currency approximately six (6) inches thick. The CS could not determine the denominations of the currency inside the

6

envelope. ESQUIVEL placed the $40.00 U.S. Currency that the CS gave to ESQUIVEL with more U.S. Currency located at the headboard of the bed in that bedroom. ESQUIVEL handed the CS one of the suspected half-ounce bags to feel. The CS told ESQUIVEL that they looked good and handed it back to ESQUIVEL. The CS asked ESQUIVEL if prior notice would be needed for a larger order. ESQUIVEL replied, "No. Just call." The meeting ended and the CS and ESQUIVEL walked to the door.

19. Agents observed the CS exit the apartment and drive to a neutral location where he/she was interviewed. It should be declared that the CS noted furniture, a television which was in use, and items in the kitchen which led him/her to believe that the unit was lived in and not merely used as an uninhabited "stash house."

B. The Second Controlled Purchase of Cocaine

20. On May 15, 2008, at approximately 12:33 pm, the CS placed a monitored and recorded phone call to ESQUIVEL for the order of one quarter kilogram of cocaine for $3,500.00. ESQUIVEL stated that he did not have the stuff and that he would call the CS back for more information. A short while later, ESQUIVEL called the CS back and told him/her that it would be ready in about an hour.

21. At approximately 2:14 pm, agents monitored and recorded the CS receiving a call from ESQUIVEL stating that he would be ready in approximately 7 minutes. At approximately 2:28 pm, agents observed a tan colored BMW X5, registered to a person known to the agents, arrive and park. This person, later identified as a person known to the agents, exited the BMW X5 carrying a small brown paper sack. The person known to the agents walked into Apartment B at 775 East Duane Ave, Sunnyvale, California. At approximately the same time agents observed and recorded the CS receiving a call from ESQUIVEL telling him/her that it was ready. Agents observed the person known to the agents exit the apartment empty-handed a few moments later and return to the person's BMW X5. The person known to the agents then departed westbound on East Duane Avenue.

22. The person and vehicle of the CS were again searched. No controlled substances were found. He/She was again outfitted with the hidden radio transmitter. To pay for the suspected cocaine, agents gave the CS the official advanced funds of $3,500.00 in U.S. Currency and concealed the cash in an open Doritos bag under a few chips.

23. Approximately 4 minutes later, agents followed the CS to 775 East Duane Avenue. The CS parked curbside and called ESQUIVEL to bring out the one quarter kilogram of cocaine. Agents observed ESQUIVEL walk out of his apartment carrying a small cylindrical black bag and enter the CS's vehicle.

24. At a later debriefing, the CS told agents the following. The CS and ESQUIVEL greeted each other, and ESQUIVEL placed the black bag on the center console of the vehicle. The CS gave ESQUIVEL the Doritos bag containing the $3,500.00 in U.S. Currency. The CS offered to let ESQUIVEL count the money before he (ESQUIVEL) departed, but ESQUIVEL declined saying that he (ESQUIVEL) trusted the CS.

25. Agents observed ESQUIVEL exit the vehicle and walk back into Apartment B. Agents clearly saw him carrying the Doritos bag in which agents secreted the cash payment for the suspected narcotics. Agents video and audio recorded this meeting and the arrival and departure of the person known to the agents.

26. Agents observed the CS depart the area of ESQUIVEL's apartment and followed him/her to a neutral site. At the neutral site the CS was interviewed and the black bag containing the suspected cocaine was collected. Inside the black cylindrical bag was a small brown paper sack further which contained a clear plastic bag further containing dense chunks of white powder. The white powdery substance field tested presumptive positive for the presence of cocaine. It should be noted that the brown paper sack appeared to be the same size and color as the one carried into the residence and left by DUENA.

8

### C. The Third Controlled Purchase of Cocaine

27. On Wednesday, May 28, 2008, at approximately 11:19 am, the CS placed a monitored and recorded phone call to ESQUIVEL in an attempt to order five kilograms of cocaine for a purchase the following day. ESQUIVEL didn't know what the situation of availability was and told the CS that he (ESQUIVEL) would call the CS back. At approximately 11:50 am, the CS placed a second monitored and recorded call to ESQUIVEL. ESQUIVEL told the CS that he was making calls to see what he could put together and that he would call the CS back with news later. At approximately 12:00 pm, ESQUIVEL called the CS and stated that he was calling multiple sources trying to get together as much as he could. This call was not monitored or recorded.

28. On Thursday, May 29, 2008, at approximately 11:01 am, the CS placed a monitored and recorded call to ESQUIVEL. ESQUIVEL told the CS that there would be no problem in getting the product. At approximately 1:00 pm, the CS placed another monitored and recorded phone call to ESQUIVEL checking the status of the purchase. ESQUIVEL told the CS that he wouldn't have it until 8 pm that night. The CS told ESQUIVEL that he had preparations to make for a trip to Oregon and that they could make the deal the following day. The CS stated that later that same night, ESQUIVEL called the CS, unmonitored and not recorded, and told the CS that he (ESQUIVEL) was trying to get the "good" stuff.

29. On Friday, May 30, 2008, at approximately 11:33 am, the CS placed a monitored and recorded phone call to ESQUIVEL. ESQUIVEL told the CS that he only had one kilogram. ESQUIVEL said that his source didn't show up. At approximately 11:41 am, the CS placed a second call to ESQUIVEL. ESQUIVEL told the CS that he still didn't have it and that his source was not answering their phone. The CS told ESQUIVEL that they could try to meet another day.

30. On Monday, June 2, 2008, at approximately 4:24 pm, the CS placed a monitored and recorded phone call to ESQUIVEL. ESQUIVEL told the CS that he had one kilogram of cocaine and that his source only had two kilograms. ESQUIVEL told the CS that he would call

9

1  his source to see if he could get the two kilograms. ESQUIVEL quoted the CS a price of
2  $21,000 per kilogram.
3       31.    On Tuesday, June 3, 2008, at approximately 12:47 pm, the CS placed a monitored
4  and recorded phone call to ESQUIVEL. ESQUIVEL told the CS that he wanted to do the deal at
5  the La Ronda Bar at 927 East Duane Avenue, Sunnyvale, in the Northern District of California.
6  ESQUIVEL stated that his source was currently eating and would be at the bar in approximately
7  twenty minutes. ESQUIVEL told the CS that he would be able to sell three kilograms of
8  cocaine. At approximately 1:20 pm, the CS placed another monitored and recorded phone call to
9  ESQUIVEL. ESQUIVEL told the CS that he was currently at La Ronda and that he wanted the
10 CS to come to La Ronda to wait for ESQUIVEL's source together. ESQUIVEL told the CS that
11 his source was on their way. At approximately 1:57 pm, the CS again placed a monitored and
12 recorded phone call to ESQUIVEL. ESQUIVEL told the CS that the source was still not there
13 and that he would make a phone call to check on their arrival time. Approximately one minute
14 later ESQUIVEL called the CS back and stated that the source was already at La Ronda waiting.
15 Approximately one minute after that call, ESQUIVEL again called the CS and told him that
16 everything was ready. The last two calls were also monitored and recorded. The person and
17 vehicle of the CS were again searched. No controlled substances were found. He/She was again
18 outfitted with the hidden radio transmitter
19      32.    On June 3, 2008, at approximately 2:05 pm, agents observed the CS arrive and
20 park in the lot of the La Ronda Bar. At approximately 2:12 pm, agents observed ESQUIVEL
21 wearing a blue backpack walking eastbound on East Duane Avenue with a Hispanic male later
22 identified as Miguel ALVAREZ-CASTANEDA. The two walked into the lot towards the bar
23 and sat down in front of the door. At this time, agents observed another Hispanic male, later
24 identified as Roberto MATOS, drive into the parking lot in a blue Toyota Camry Solara.
25 MATOS parked near the front of La Ronda and remained in his vehicle. Agents observed
26 ESQUIVEL leave the backpack with ALVAREZ-CASTANEDA and walk to the CS's vehicle.

At approximately the same time, agents observed ALVAREZ-CASTANEDA walk to and enter the passenger side of MATOS's blue Toyota while carrying the backpack that ESQUIVEL had left with him a few moments earlier. Once at the CS's vehicle, ESQUIVEL entered the passenger side. ESQUIVEL told the CS that he had the cocaine but wished to go behind the building to complete the transaction. The CS refused and said that the deal would only continue in the front parking lot.

33.     Agents then observed ESQUIVEL exit the CS's vehicle and walk to MATOS's blue Toyota. At this time, MATOS and ALVAREZ-CASTANEDA exited the vehicle. Agents observed ALVAREZ-CASTANEDA give the backpack to ESQUIVEL. ESQUIVEL, now with the blue backpack, returned to the CS's vehicle. After giving ESQUIVEL the backpack, agents observed ALVAREZ-CASTANEDA and MATOS enter the La Ronda Bar. Agents observed ESQUIVEL once again enter the CS's vehicle. A few moments later, the CS gave the prearranged Bust Signal at approximately 2:16 pm. At this time agents arrested ESQUIVEL from the CS's vehicle. Agents also went into the La Ronda Bar and arrested ALVAREZ-CASTANEDA and MATOS. When agents took ESQUIVEL into custody, they collected the blue backpack that he carried into the CS's vehicle. Inside the backpack was a taped brick, consistent with the packaging narcotics traffickers use to transport kilograms of cocaine, sitting on top of a box which containing a zip top bag containing chunks of white powder. The contents of the zip top bag were field tested for the presence of cocaine. The test resulted in a presumptive positive for the presence of cocaine. The two packages weighed a combined 2,200.8 gross grams. At the time of his arrest, ALVAREZ-CASTANEDA attempted to conceal two cellular phones in his possession by sliding them into an ice well on the other side of the bar. This attempt was witnessed by the arresting agents and the phones were collected. One of the phones contained photos of ESQUIVEL and a Hispanic female.

34.     At approximately 3:10 pm, agents traveled to 775 East Duane Avenue, Apartment B, Sunnyvale, California. Agents executed a Federal Search Warrant signed by the Honorable

11

Judge Patricia Trumbull. At the residence agents located a silver suitcase at the foot of the bed in the southernmost bedroom. Inside the suitcase was an undetermined amount of U.S. Currency, two scales containing white powdery residue, zip top clear bags, and indicia with ESQUIVEL's name on it. In the dresser next to the bed, there were several bindles of white powder, more indicia with ESQUIVEL's name on it, and a sifter with white powdery residue on it.

35. Once back at the San Jose Resident Office, ESQUIVEL, ALVAREZ-CASTANEDA, and MATOS were processed and interviewed. All three suspects were read their Miranda warnings in Spanish by DEA Group Supervisor John Fernandez from form DEA-13b. All three individually understood their rights and chose to speak with agents.

36. MATOS stated to agents that he didn't know ALVAREZ-CASTANEDA or ESQUIVEL. MATOS then stated that he did know ALVAREZ-CASTANEDA from Mexico and that he played volleyball with him in the past but that this was the first time he'd (MATOS) seen ALVAREZ-CASTANEDA in a long time. MATOS stated that someone called him to meet ALVAREZ-CASTANEDA so that ALVAREZ-CASTANEDA could ask MATOS something. MATOS stated that he was hoping that ALVAREZ-CASTANEDA would ask him to work for him. MATOS said that he had nothing to do with "this." MATOS continued to deny any knowledge of the two kilograms of cocaine that were in his vehicle earlier that day. At this point, his interview ended.

37. ALVAREZ-CASTANEDA stated that he didn't know MATOS. After that, ALVAREZ-CASTANEDA stated that he only knew MATOS in passing. ALVAREZ-CASTANEDA said that he was only in the bar drinking and sitting next to MATOS when he was arrested. ALVAREZ-CASTANEDA first stated that he walked to the bar with his girlfriend. Later ALVAREZ-CASTANEDA told agents that he was walking alone going to meet with his girlfriend. ALVAREZ-CASTANEDA denied ever touching the blue backpack. ALVAREZ-CASTANEDA was shown the video footage leading up to his arrest earlier that day. ALVAREZ-CASTANEDA was asked about the telephones that were retrieved from the ice well

at the La Ronda Bar. ALVAREZ-CASTANEDA denied that the phones were his and denied any knowledge of them. ALVAREZ-CASTANEDA continued to make contradictory statements to agents after confronted with video evidence of his involvement. At this point, his interview ended.

38.	ESQUIVEL was shown video footage from his arrest earlier that day and from the quarter kilogram purchase on May 15, 2008. Agents showed ESQUIVEL the cellular phones collected from ALVAREZ-CASTANEDA and MATOS, and other evidence held against him. ESQUIVEL first attempted to convince agents that the person known to the agents, as seen on video taken on May 15, 2008, walked in and dropped off some cocaine for ESQUIVEL. Agents then showed ESQUIVEL the black cylindrical bag and the brown paper bag from which the quarter kilogram of cocaine was retrieved. When confronted with this evidence, ESQUIVEL conceded that the person known to the agents had arrived to drop off the quarter kilogram destined for the CS.

39.	Regarding the two kilograms of suspected cocaine from June 3, 2008, ESQUIVEL told agents that he got the one kilogram packaged in the box from his source he knows as "Chaparro." ESQUIVEL identified the person known to the agents from video footage on May 15, 2008, as "Chaparro." ESQUIVEL said that his sole source of supply is the person known to the agents. ESQUIVEL stated to agents that he attempted to order the five kilograms from the person known to the agents. ESQUIVEL stated that he usually purchases one quarter kilogram quantities from the person known to the agents about every two weeks. ESQUIVEL said that the person known to the agents was uncomfortable selling ESQUIVEL such a large amount and so only sold him one kilogram. ESQUIVEL told agents that ALVAREZ-CASTANEDA was his associate in selling cocaine. ESQUIVEL asked ALVAREZ-CASTANEDA for help finding more cocaine to sell to the CS. ESQUIVEL said ALVAREZ-CASTANEDA set up for another source to meet them at La Ronda for an additional kilogram of cocaine.

///

40.     ESQUIVEL told agents that ALVAREZ-CASTANEDA was dropped off at his (ESQUIVEL's) residence by ALVAREZ-CASTANEDA's girlfriend earlier that day. ESQUIVEL, wearing the blue backpack, walked with ALVAREZ-CASTANEDA to La Ronda Bar. ESQUIVEL believed that ALVAREZ-CASTANEDA didn't own a cellular phone but was talking on a phone borrowed from his (ALVAREZ-CASTANEDA's) girlfriend on the walk to La Ronda. ESQUIVEL said that the first time that he went to talk to the CS, he left his cellular phone and the blue backpack, containing only the single kilogram of cocaine, with ALVAREZ-CASTANEDA. At that point he (ESQUIVEL) met with the CS and ALVAREZ-CASTANEDA met with MATOS. ESQUIVEL believed MATOS to be the other supplier that ALVAREZ-CASTANEDA contacted. When ESQUIVEL collected the backpack from ALVAREZ-CASTANEDA at MATOS's blue Toyota, he (ESQUIVEL) trusted ALVAREZ-CASTANEDA to have placed the second kilogram from MATOS into the backpack. ESQUIVEL walked back to the CS's vehicle and entered. ESQUIVEL stated that the first time he saw the second tape-wrapped kilogram brick was when the CS saw it.

41.     ESQUIVEL stated that this was the first time he'd ever met MATOS but that he trusted ALVAREZ-CASTANEDA so he knew that the second kilogram of cocaine would be in the backpack to sell to the CS. ESQUIVEL told agents that he owed the person known to the agents $14,000 for the kilogram he (ESQUIVEL) was going to sell to the CS for $21,000. ESQUIVEL also told agents that he was going to pay MATOS $20,500 for the second, higher quality kilogram of cocaine for which he was going to sell to the CS for $21,500. ESQUIVEL said that he was intending to pay MATOS directly after receiving payment from the CS. ESQUIVEL then stated that he (ESQUIVEL) intended to pay ALVAREZ-CASTANEDA approximately $2,000 for his help with the transaction. ESQUIVEL also claimed that the phone that was retrieved from the ice well at La Ronda bar belonged to him. In light of ESQUIVEL's cooperation, he was allowed to make several attempts to phone his girlfriend at approximately 9:05 pm. At this point his interview ended.

14

42. Agents had MATOS's blue Toyota Solara towed away from the La Ronda parking lot. Once the vehicle was impounded at the San Jose Resident Office, an inventory of the property was conducted. Looking into the open trunk, Special Agent Michael Robinson saw that the pass- through from the trunk to the passenger compartment was covered by a welded in plate and then partially re-upholstered. On the floor of the rear seat, Special Agent Robinson noted coffee grounds. Also on the floor Special Agent Robinson noted a toothpick. Special Agent Robinson located the owner's manual inside the vehicle and observed that the knobs described to assist in the folding down of the rear seats were not present. Where the manual described that the knobs should be, Special Agent Robinson found indentations under the upholstery. Newark Police Department K-9 Hank and handler Officer Pat Smith walked around and inside the vehicle. Hank alerted to the back seat for the presence of narcotics. Based on his training and experience and the aforementioned indicators, Special Agent Robinson believed that the blue Toyota registered to and driven by MATOS, contained a concealed compartment for the transport of illegal narcotics. SA Robinson felt between the two rear seat sections and came across a void behind the seat but in front of the welded piece of metal. Agents checked inside the void and discovered an empty plastic bottle labeled as Inositol, a common adulterant/ dilutant for cocaine. Also in the void were two bags, one of which contained several bundles of tape that appeared to have been at one time wrapped around kilogram quantities of suspected cocaine and then cut away. Based on training and experience, the empty tape bundles smelled like cocaine. The other bag had a container labeled Lido Scent. The warning on the package stated that the product is, "Not for use in adulterating controlled substances."

### III. CONCLUSION

43. Based on the foregoing, I believe that there is probable cause to believe that Pablo Cesar Esquivel, Miguel Alvarez-Castaneda, and Roberto Matos are each guilty of a violation of Title 21, U.S.C. §§ 841(a)(1), 841(b)(1)(B)(ii)(II) and 846, conspiracy to possess with intent to

///

15

distribute cocaine HCL. I therefore request the issuance of a criminal complaint against Pablo Cesar Esquivel, Miguel Alvarez-Castaneda, and Roberto Matos for this offense.

_____
Anthony J. Herrera, Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me

before me this ____4th____ day of June 2008

_____
RICHARD SEEBORG
United States Magistrate Judge
Northern District of California

16